NOT DESIGNATED FOR PUBLICATION

No. 122,349

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
N.D.,
A MINOR CHILD.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; JANE A. WILSON, judge. Opinion filed July 10, 2020. Affirmed.

*Michael J. Nichols*, of Michael J. Nichols P.A., of Kansas City, Kansas, for appellant natural mother.

*Daniel G. Obermeier*, assistant district attorney, and *Mark A. Dupree* Sr., district attorney, for appellee.

Before GARDNER, P.J., BRUNS and WARNER, JJ.

PER CURIAM: The natural mother of N.D., a minor child, appeals the termination of her parental rights. On appeal, Mother contends that there is not clear and convincing evidence to justify the district court's finding that her parental rights should be terminated. Likewise, she contends that the termination of her parental rights is not in the best interests of the minor child. Based on our review of the record on appeal, we find that there is sufficient evidence to establish by clear and convincing evidence that the mother is unfit and that the termination of her parental rights is in the best interest of the minor child. Thus, we conclude that the district court did not err in terminating the mother's parental rights and we affirm its decision.

1

N.D. is a male child born in January 2013. When he was three years old, the State filed a child in need of care (CINC) petition in which it alleged that he was without adequate parental care, control, or substance, was without the care or control necessary for the child's physical, mental, or emotional health, and had been physically, mentally, or emotionally abused or neglected. Mother stipulated to the allegations in the petition and the district court found N.D. to be in need of care. We note that the minor child's natural father is deceased.

In the CINC petition, the Kansas Department for Children and Families (DCF) alleged that it had received a report that N.D. was in unsafe living conditions. Specifically, the petition alleged that when police officers arrived at the house in Prairie Village, Kansas on August 5, 2016, they found N.D. with his maternal grandmother. The police noted that the grandmother appeared to be under the influence of drugs, and she admitted to having used methamphetamine.

The officers also noticed that N.D. was dirty, and it appeared that no one had bathed him for several days. N.D.'s eyes were swollen and pink. Moreover, he had a small cut on his left hand. The officers found that there was no nutritious food in the house and observed that neither the toilets nor the showers were working.

According to the CINC petition, the police contacted Mother, and she arrived at the house where N.D. was found. She told the officers that she had voluntarily given N.D.'s maternal grandfather temporary custody because she did not have a job and was homeless. When the grandfather was contacted, he said that he had left N.D. with the grandmother at a hotel in Kansas City, Missouri, because he could not find a babysitter when he went to work. However, he did not know how N.D. and the grandmother ended up in Prairie Village.

On October 27, 2016, the court adjudicated N.D. to be a child in need of care. Mother stipulated that the statements in the CINC petition were true. For the next three years, N.D. remained in the custody of DCF and was placed in foster care. After attempts at reintegration failed, the State filed a petition requesting that Mother's parental rights be terminated. On August 12, 2019, the district court held an evidentiary hearing. At the hearing, the State presented testimony from Ramona MacDougall—who was the Court Services Officer assigned to N.D.'s case—and Kari Harman, a case manager from KVC Kansas. In addition, Mother testified on her own behalf. The guardian ad litem appointed to represent N.D.'s interests participated in the hearing but did not call any witnesses.

MacDougall testified that she began working on the case on August 9, 2016. Further, she testified that Mother was given a list of tasks to perform in order to work towards reintegration. Although Mother initially made progress in her reintegration plan, this progress stalled when she was incarcerated. The record reflects that Mother was in prison from October 16, 2017 to August 11, 2019. During that time, Mother kept phone contact with N.D. but did not see him. In prison, Mother received her CNA license and completed other education classes. However, the classes Mother took were not part of her reintegration requirements.

MacDougall testified that Mother was released from prison the day before trial and had not yet provided documents listing her housing or income. MacDougall also noted that Mother had a felony possession of methamphetamine case pending against her in Johnson County. MacDougall testified that KVC had not reported any concerns with Mother's parenting skills during her visits with N.D. prior to her incarceration.

Moreover, she indicated that Mother had completed a 30-day inpatient drug treatment at Mirrors, Inc. and voluntarily stayed for an additional 30-day reintegration program. MacDougall was concerned with continuing to pursue reintegration because N.D. had not seen Mother since her incarceration began and MacDougall did not know

3

where Mother was living, or if she even had a place to live, or if Mother had a job. MacDougall was also concerned because she did not know how the Johnson County possession case would resolve. MacDougall did not know if Mother could become fit in the foreseeable future because she did not know how long it might take Mother to complete her reintegration tasks. Ultimately, MacDougall recommended termination of parental rights as the best course of action.

Harman testified that she began working on N.D.'s case in December 2018. According to Harman, when KVC workers first met N.D., he was "like a feral child," and was developmentally delayed. She testified that N.D. had made significant improvements since his removal from Mother's care and she attributed those improvements to the care provided by his foster mother. Harman testified that N.D. regularly talked on the phone with Mother, but she did not know if N.D. had bonded with her. On the other hand, she indicated that N.D. had a very close bond with his foster mother and her daughter. Harman noted that N.D.'s foster mother had facilitated meetings between N.D. and his family.

During her testimony, Mother admitted to having a drug addiction. However, she testified she had been sober for six months before her incarceration. Mother indicated that she was incarcerated in Missouri for the last two years for burglary. She also testified that she had been charged in Johnson County with possession of methamphetamine before her incarceration in Missouri. She also admitted to having an outstanding felony charge in Clay County, Missouri, for robbery, but stated that she planned to contest that charge.

Mother testified she had a home and a job before her incarceration. Likewise, she indicated that she had completed parenting classes through KVC and multiple unsupervised visits with N.D. While incarcerated, Mother earned her GED and a CNA certificate. She also completed classes regarding the impact of crime on victims, the

4

decision-making process as well as a personal banking class. Although she tried to take parenting classes, she was placed on a waitlist and was released before she could enroll.

Following her release from prison, Mother found a place to live with a family friend and planned to work with an agency to find a job. Mother stated that she also planned to attend AA meetings with her mother. Mother believed N.D. knew who she was and that he had bonded with her. She indicated that they usually talked on the phone once a month during her incarceration. On cross-examination, Mother disagreed with the State's suggestion that N.D. was in poor shape when found by the police. Instead, Mother asserted that N.D. was very well taken care of prior to being removed from her care. Nevertheless, Mother admitted she had not seen N.D. since October 2017 because of her incarceration.

Although the district court commended Mother for her hard work, it noted that she failed to complete her reintegration plan because of her incarceration. The district court found Mother was presumed unfit under K.S.A. 2019 Supp. 38-2271(a)(6), which shifted the burden to her to prove her fitness. Further, the district court found that Mother had failed to overcome the presumption. The district court also found Mother unfit under K.S.A. 2019 Supp. 38-2269(b)(4), (b)(5), (b)(7), and (b)(8), and that her unfitness was unlikely to change in the foreseeable future. Finally, the district court found the termination of Mother's parental rights were in N.D.'s best interests.

The district court filed a journal entry on August 12, 2019, in which it set forth its findings of fact and conclusions of law. The district court also concluded that N.D. should remain in DCF custody and that the agency would have the power to place the child for adoption. Thereafter, Mother timely appealed.

ANALYSIS

On appeal, Mother contends that the district court erred in finding her unfit and terminating her parental rights. She also contends that the district court erred in concluding that the termination of her parental rights is in the best interests of the minor child. In response, the State contends that the district court properly found by clear and convincing evidence that Mother was unfit and that such condition was unlikely to change in the foreseeable future. The State also contends that the district court properly found by a preponderance of the evidence that termination of Mother's parental rights is in N.D.'s best interests. Although we recognize that termination of parental rights is a serious matter and that this is a difficult case, we find no error in the district court's decision based on our review of the entire record.

A parent has a constitutional protected liberty interest in the relationship with his or her child. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); see also *In re B.D.-Y*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Accordingly, the State may terminate the legal rights of a parent only upon "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a). If a district court makes such a finding, it must then consider whether termination is in the best interests of the child. Ultimately, the primary concern of both district courts and appellate courts is the physical, mental, and emotional health of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

Mother argues there was not clear and convincing evidence she was unfit or, even if she was, that the condition was unlikely to change in the foreseeable future. She points to the fact that she completed most of her the tasks required for reintegration before going to prison in Missouri for two years. She also points to the fact that she maintained contact with N.D. while in prison and took several educational classes to learn new skills.

However, the State points to the presumption of unfitness that attached pursuant to K.S.A. 2019 Supp. 38-2271(a)(6), and asserts that Mother has failed to overcome that presumption. Further, the State argues Mother's unfitness is unlikely to change in the foreseeable future because she was released from prison only a day before the termination hearing and faces additional charges.

When reviewing a district court's determination that a parent is unfit for the foreseeable future, "an appellate court asks whether, based on the full evidentiary record considered in a light favoring the State as the prevailing party, a rational fact-finder could have found that decision 'highly probably, i.e., [supported] by clear and convincing evidence.' *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008)." *In re M.S.*, 56 Kan. App. 2d 1247, 1255-56, 447 P.3d 994 (2019). Moreover, we are not to reweigh evidence, pass on the credibility of witnesses, or decide disputed questions of fact. Instead, we must resolve any conflicts of evidence in favor of the prevailing party. 56 Kan. App. 2d at 1256.

Here, the district court found a presumption of unfitness applied to Mother under K.S.A. 2019 Supp. 38-2271(a)(6). Under K.S.A. 2019 Supp. 38-2271(a), a district court presumes a parent is unfit if the State establishes, by clear and convincing evidence that:

> "(6)(A) the child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; (B) the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; and (C) there is a substantial probability that the parent will not carry out such plan in the near future."

Once the State establishes the presumption, the burden of proof shifts to the parent to rebut it by a preponderance of the evidence. If the parent cannot prove present fitness or fitness in the foreseeable future, the district court must terminate parental rights. K.S.A. 2019 Supp. 38-2271(b).

7

Mother does not dispute that N.D.—who is now 7 years old—has been in an out-of-home placement for more than half of his life. Likewise, she recognizes that she did not complete the tasks assigned to her in the reintegration plan. Instead, she argues that she would be able to complete those tasks in the near future. Viewing the facts in the light most favorable to the State as the prevailing party, we do not find that the district court erred in determining that Mother failed to prove by a preponderance of the evidence that there was a substantial probability that she could complete the tasks assigned to her in the near future.

Unfortunately, Mother had only been out of prison one day at the time of the termination hearing. Moreover, at the time of the hearing, she was facing felony charges in Kansas and Missouri. She admitted police found methamphetamine in her car—which resulted in a charge in Johnson County. In light of her criminal history, Mother faced the possibility of additional prison time in that case. In addition, she faced the possibility of additional prison time in Missouri on a robbery charge. Even if she does not go back to prison, Mother's foreseeable future would likely be occupied with defending herself against the new criminal charges. Accordingly, we find the district court did not err in ruling that the presumption applied or in ruling that Mother had failed to overcome the presumption.

In addition to finding the presumption applied, the district court found four of the statutory factors in K.S.A. 2019 Supp. 38-2269(b) applied:

> "(4) physical, mental or emotional abuse or neglect or sexual abuse of a child;
> "(5) conviction of a felony and imprisonment;
> . . . .
> "(7) failure of reasonable efforts made by appropriate public or private agencies
> to rehabilitate the family;

8

"(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the basic needs of the child."

Based on our review of the record, we find that the State proved each of these factors by clear and convincing evidence. We will address each of these factors below. However, it is important to recognize that any one of the statutory factors, standing alone, would be sufficient to find a parent to be unfit. See K.S.A. 2019 Supp. 38-2269(f).

First, the district court found Mother was unfit pursuant to K.S.A. 2019 Supp. 38-2269(b)(4) because of the physical, mental, or emotional abuse or neglect of N.D. The record reflects that police officers found N.D. in a house in Prairie Village in August 2016, with his maternal grandmother and the homeowner. Both adults in the house were under the influence of drugs. The house smelled of fungus or mold and there was no nutritious food in the house. Moreover, the showers and toilets did not work.

The officers noted that N.D. looked like no one had bathed him in several days and needed a diaper change. His eyes were swollen and pink. In addition, he had a cut on his left hand. N.D. was in that house because Mother left the three-year-old with his grandfather who, in turn, left him with his grandmother in Kansas City, Missouri. When contacted by the police, the grandfather did not know how N.D. ended up in Prairie Village because the grandmother did not have a car. Thus, a reasonable person could agree with the district court that there was clear and convincing evidence presented that N.D. was abused or neglected.

Second, the district court found that Mother was unfit pursuant to K.S.A. 2019 Supp. 38-2269(b)(5) because she had been convicted of a felony and imprisoned, impeding her ability to parent N.D. Mother's convictions for burglary and possession of methamphetamine are undisputed. As a result, she spent two years in a Missouri prison and was released the day before the trial. Hence, the district court did not err in finding

9

clear and convincing evidence existed that Mother was convicted of a felony and imprisoned.

Third, the district court found Mother to be unfit under K.S.A. 2019 Supp. 38-2269(b)(7) because reasonable efforts to rehabilitate the family had failed. Mother does not dispute that DCF and KVC made reasonable efforts to reintegrate N.D. into her care. Rather, she contends that she made significant progress in completing the assigned tasks and argues that she would make more progress now if given the opportunity to do so.

We have no doubt that Mother loves her child and desires reintegration with him. Unfortunately, a review of the record clearly and convincingly reveals that a case plan had been in place for three years by the date of the termination hearing, but the tasks assigned to Mother remained uncompleted. Thus, when viewed in a light most favorable to the State, we conclude that the district court did not err in finding that the reasonable efforts at rehabilitation of the family had failed.

Fourth, the district court found Mother to be unfit pursuant to K.S.A. 2019 Supp. 38-2269(b)(8), because of lack of effort by Mother to adjust her circumstances to meet N.D.'s needs. Again, we note that Mother tried to complete several of the tasks assigned to her in the reintegration plan. However, these efforts stalled when Mother went to prison for two years. As noted above, she was facing two more felony charges that could result in additional incarceration at the time of the termination hearing. As such, when viewed in a light most favorable to the State, we do not find it to be unreasonable for the district court to find by clear and convincing evidence that Mother failed to change her conduct or conditions in order to meet the needs of her minor child.

Because we conclude that the district court did not err in finding by clear and convincing evidence that Mother was unfit, we turn to the issue of whether the district court erred in determining that Mother's unfitness was unlikely to change in the

10

foreseeable future. In reviewing foreseeability in a termination of parental rights case, we apply "child time" because children perceive time differently than adults. K.S.A. 2019 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008). As this court has found, "children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition." *In re M.S.*, 56 Kan. App. 2d at 1263. Likewise, we look to a parent's past conduct as an indicator of future behavior. 56 Kan App. 2d at 1264.

Once again, we find clear and convincing evidence in support of the district court's determination that the conditions resulting in Mother being found unfit were unlikely to change in the foreseeable future. At the time of the termination hearing, half of N.D.'s life had been in State custody. For two of those years, Mother was incarcerated and his only contact with her was by telephone.

Although Mother had made progress toward reintegration before her incarceration, she had been unable to continue to do so while in prison. Furthermore, the outlook for Mother to be in a position to complete the tasks assigned to her for reintegration were still bleak at the time of the hearing. This is because she was facing two more felony charges that could lead toward more prison time.

If Mother was incarcerated again, which was a very real possibility in light of her criminal history, she still would likely be unable to progress toward reintegration until she was released from prison again. Moreover, even if she was not incarcerated again, much of her attention for the foreseeable future would be directed toward defending the additional criminal charges. Therefore, we find that the district court's finding that Mother's unfitness was unlikely to change for the foreseeable future is also supported by clear and convincing evidence.

11

Finally, we turn to the issue of the best interests of the child. Mother argues that the district court improperly focused on weighing the Mother's merits against the merits of the foster mother. In response, the State argues Mother only holds a limited bond with N.D. and that he has made substantial progress since being placed in DCF custody. The State also points out that even Mother had considered consenting to N.D.'s adoption by his foster family as a result of the advancements he has shown since moving in with them.

"If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2019 Supp. 38-2269(g)(1). We review a district court's finding that termination of parental rights is in the best interests of the child for abuse of discretion. A district court abuses its discretion if: (1) no reasonable person would agree with its ruling; (2) it commits an error of fact; or (3) it commits an error of law. See *In re M.S.*, 56 Kan. App. 2d at 1264.

A district court's best interests finding must be supported by the preponderance of the evidence. 56 Kan. App. 2d at 1264. In giving primary consideration to the physical, mental, and emotional health of the children, a "court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010). In doing so, a district court should consider the nature and strength of the relationship between the child and the parent as well as the trauma that termination may cause the child and weigh those considerations against further delay in finding permanency for the children. 43 Kan. App. 2d at 904.

While the State did mention N.D.'s foster placement several times during the termination hearing, a review of the record suggests that it did so to emphasize the differences between the child's abilities between the time he was initially placed in DCF custody and now. Also, we note that the district court only briefly commented that it

12

appeared N.D. was doing well in his foster placement. Otherwise, the district court focused on the statutory factors and the evidence presented in support of those factors. Regardless, we do not find it to be error for a district court to praise the efforts of a foster family if such recognition is deserved. Likewise, simply recognizing that a child is doing well in foster placement is different from terminating a parent's rights because the foster family would provide a better home for a child. See *In re K.L.B.*, 56 Kan. App. 2d 429, 448, 431 P.3d 883 (2018) (holding district court did not err by praising foster family from bench when it also referenced appropriate legal standard and made extensive findings on the record).

In this case, a reasonable person could agree with the district court's finding that terminating Mother's parental rights was in N.D.'s best interests. At the time of the termination trial, N.D. was six years old and had already been outside of Mother's care for three years. Moreover, the record reflects that N.D. was initially described as "like a feral child" and was developmentally delayed. At that point, N.D. could only respond to questions with one syllable answers.

It is also reasonable to believe that Mother's incarceration for a significant portion of N.D.'s young life likely impeded the development of his relationship with her. See *In re M.H.*, 50 Kan. App. 2d 1162, 1172, 337 P.3d 711 (2014). Fortunately, Harman testified at the termination hearing that N.D. is now better adjusted. Accordingly, we conclude that the district court did not err in finding by a preponderance of the evidence that the termination of Mother's parental rights was in the best interests of N.D.

In summary, we recognize that Mother worked hard to achieve reintegration before her incarceration and that she worked to improve herself in prison. Likewise, we do not discount her good intentions regarding wanting to now take the steps necessary to be reintegrated with her son. "But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final

resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). Consequently, we affirm the district court's decision to terminate Mother's parental rights in this case.

Affirmed.